## KINSEY v FLORIDA DEPARTMENT OF NATURAL RESOURCES

### Case No. 88-3801

State of Florida, Division of Administrative Hearings

January 10, 1989

**APPEARANCES OF COUNSEL**

**Gaylord L. Kinsey,** pro se.

**Laura S. Leve,** Assistant General Counsel, Department of Natural Resources, for respondent.

**OPINION OF THE COURT**

ARNOLD H. POLLOCK, Hearing Officer.

*RECOMMENDED ORDER*

A hearing was held in this case in Dade City, Florida on December 6, 1988, before Arnold H. Pollock, Hearing Officer. The issue for

consideration is whether Petitioner was unlawfully discriminated against because of his race when he was suspended and thereafter reassigned to another facility of the Florida Park Service.

## BACKGROUND INFORMATION

On March 11, 1987, the Petitioner, Gaylord L. Kinsey filed a Charge of Discrimination with the Florida Commission on Human Relations, (Commission), alleging that his employer, the State of Florida Department of Natural Resources, (Department), had unlawfully discriminated against him because of his race by suspending him from duty for three days and transferring him as a park attendant from his duty site at the Hillsborough River State Park, HRSP), to Honeymoon Island State Recreation Area. The matter was referred to an investigator and upon completion of the inquiry, the Commission, on July 7, 1988, entered a Determination of No Cause. Thereafter, on July 17, 1988, the Petitioner requested a formal hearing to contest the determination of No Cause and, on July 29, 1988, the matter was forwarded to the Division of Administrative Hearings for appointment of a Hearing Officer. On August 8, 1988, the undersigned set the case for hearing on October 14, 1988 in Pasco County, Florida, but due to complications in the undersigned's schedule, the matter was, *sua sponte,* continued until December 6, 1988, at which time it was heard as scheduled.

At the hearing, Petitioner testified in his own behalf and introduced Petitioner's Exhibits A through E. Respondent presented the testimony of several employees of the Department including Alyce Parmer, Chief, Bureau of Personnel; Diane Coulson, a ranger; John A. Keenan, a ranger; Barbara J. Garrison, a ranger; Marlene E. Phinney, a secretary specialist; Keith H. Thompson, Jr., Assistant Park Manager at HRSP; Perry Jay Smith, Park Manager at HRSP; and Torrey M. Johnson, District Manager of ten parks with the Department. Respondent also introduced Respondent's Exhibits 1 through 7.

Subsequent to the hearing, Respondent submitted Proposed Findings of Fact which have been ruled upon and, as modified and appropriate, incorporated herein. Petitioner had no post-hearing filing.

## FINDINGS OF FACT

1. At all times pertinent to the issues involved herein, Petitioner, Gaylord L. Kinsey, was employed by the State of Florida, Department of Natural Resources, as a laborer at HRSP.

2. Respondent, Department, is an employer within the meaning of the Human Rights Act. Petitioner's Complaint and subsequent Petition

248

for Formal Hearing, are timely and the Division of Administrative Hearings, as well as the Commission, has jurisdiction over the matter at issue.

3. Mr. Kinsey came to work with the Department as a laborer at HRSP on March 1, 1985. At that time, he was furnished with a copy of the Department's Employee Handbook which outlines all pertinent personnel rules regarding leave, time off, absenteeism, grievances, and other matters incident to the routine terms of employment. He was hired as a result of the application he filed in response to a Departmental vacancy announcement.

4. On July 7, 1986, Petitioner was orally reprimanded by his supervisor, Stephen A. Yoczik, then Assistant Park Manager, for being absent without leave on July 6, 1986. At that time he was warned that any further failure to comply with the provisions of the Department's directive on absenteeism might result in further disciplinary action. The oral reprimand was confirmed in an interoffice memorandum dated July 12, 1986, a copy of which was placed in the Petitioner's master personnel file.

5. On February 5, 1987, Mr. Kinsey was given an official written reprimand for loafing, defined as continued and deliberate idleness during work hours which results in the employee's failure to perform assigned tasks. Background information provided to the Petitioner at that time indicated that he was observed to be wasting time in idle talk with two other employees at the shop area for a 25 minute period past his lunch hour. Petitioner was advised again in writing that his lunch hour was to be taken between noon and 1 PM unless he received permission from a supervisor to do otherwise. This follows on the heels of another official reprimand which was imposed on Petitioner on January 16, 1987 for loafing the prior day when, at 7:30 PM he was observed watching television at the shop and not being out performing his job duties.

6. Petitioner contends that while he may have taken his lunch hour at the inappropriate time, this was a practice approved by management which permitted employees to finish particular tasks in which they were engaged at the lunch hour and to eat thereafter. Petitioner also contends that in many cases, especially during the period of short days, he would prefer to get his work done early before it got dark by working straight through the duty day and taking his lunch hour at the end of the day. Regardless of how well intentioned or well reasoned Petitioner's approach may be, it is, nonetheless, inconsistent with and in violation of the directives he received which were applicable not

**249**

only to him, but to other employees as well. Consequently, the reprimands for loafing, as identified, are neither in error nor inappropriate.

7. Petitioner was interviewed by his supervisors about his disciplinary problems on both February 5 and 6, 1987 during which time he became extremely excited and angry and, on one occasion, broke a chair when he got up precipitously. Because of this demonstrated instability and hostility, he was, on February 19, 1987, directed by Mr. Johnson, the District Manager, to use accrued leave with pay during the period February 21 through March 10, 1987.

8. Also on February 19, 1987, Mr. Johnson notified Petitioner by letter of the Department's intent to suspend him without pay for a period of three working days, (March 11-13, 1987), for the two incidents of belligerence and one unauthorized absence which took place on February 7 and 8, 1987. Petitioner responds to these allegations by contending at the hearing that he in no way threatened the supervisors either physically or verbally and was merely responding to the stress situation in which he found himself. The unauthorized absence took place when Petitioner experienced automobile difficulties and was unable to get to work on time. When he called in, he was advised it was necessary for him to talk to his supervisor about the problem. This was consistent with the long-standing Department procedure regarding requesting time off. Approximately one-half hour later, Petitioner again called the park office looking for his supervisor and was again advised to get in touch with his supervisor because the park manager, Mr. Smith, just the previous week, had stressed that coordination with a supervisor prior to absence was mandatory. Petitioner indicated he was at a pay phone calling long distance and, according to Ms. Garrison, to whom he spoke, asserted his opinion that the manager's policy was stupid and he did not agree with it. Approximately 45 minutes later, Mr. Smith came in to the park office and Ms. Garrison advised him of Petitioner's calls and auto troubles. At that point, Mr. Smith attempted to call Petitioner back but could not get him.

9. The procedure for requesting leave is contained in a Department interoffice memorandum dated July 21, 1986 and was stressed at various personnel meetings which were attended by the Petitioner. Personnel were notified that either the park manager or his assistant were the only ones who could authorize leave. Memos memorializing the subjects covered at the meetings specifically emphasize that employees are not to call the office to leave work but to call the approval authorities at home if need be. It would appear, therefore, that while

250

Petitioner's basis for his absence may well have been valid, he failed to conform to the publicized requirements regarding the method of obtaining the leave he needed and, therefore, the disciplinary action, the last in a series, was appropriate.

10. During this period, officials became concerned over what appeared to be Petitioner's abnormal behavior. On one occasion, he threatened to put poison in his lunch sandwiches in an effort to punish those individuals responsible for stealing his lunch out of the refrigerator in the camp's work area. Petitioner alleges, and it is accepted, that on several occasions, his lunch was stolen. His response, however, was excessive and though he well may not have intended to follow through on his threat, the fact that it was made was inappropriate.

11. In addition, on at least one occasion, while commenting about a series of news articles concerning a gunman who had shot and killed several people in a fast food restaurant, Petitioner stated that he had a gun and that, "While Gaylord Kinsey, the preacher, would not hurt anyone, Gaylord Kinsey, the man, might shoot someone" but that his friends would be safe. Mr. Kinsey denies having threatened to shoot anyone but admits having indicated he had a gun. This incident took place about the time Mr. Kinsey was having domestic difficulties involving suspected infidelity on the part of his wife and that stress, coupled with the disciplinary difficulties in which he found himself, created a pressure situation he was incapable of handling.

12. When Mr. Kinsey was approached by park officials concerning the weapon, he permitted a search of his vehicle. No weapon was found. He voluntarily agreed to accompany sheriff's deputy to the local crisis intervention center but declined to voluntarily admit himself and turned up at the Assistant Park Manager's house that evening. At that time, he advised the Assistant Manager he did not have a weapon and at no time, it might be added, did Mr. Kinsey either directly or indirectly threaten any park employee. His comments now appear to be no more than attempts to frighten his associates and there is no indication he would have committed any violence against any employee or park patron.

13. In any event, park authorities requested he be evaluated by a psychiatrist at Department expense to which he agreed. The doctor concluded that though Petitioner is overly sensitive and appears to react to adversity in any hysterical fashion, he does not appear to have any abnormal though processes and his judgment is not impaired. He suffers from a poor self concept and reacts to rejection in a violent fashion. He appears to have poor impulse control when under stress.

251

The doctor concluded that Petitioner should continue to seek ongoing psychiatric help.

14. An additional psychiatric evaluation rendered on Petitioner several months later by another psychiatrist was totally consistent with the former diagnosis. The second doctor indicated there was no suicidal or homicidal ideation but that Petitioner had a low ability to handle stress, rules, and regulations.

15. After considering all the above information, Mr. Smith, the Park Manager, communicated with the District Manager, Mr. Johnson, regarding his concerns about Mr. Kinsey's stability and his further concerns for the safety of park employees and patrons. Mr. Johnson in turn communicated with Park Service officials in Tallahassee and a collective decision was made to reassign Mr. Kinsey from HRSP to another Park Service facility several miles away. Notwithstanding Petitioner's allegations, there is no evidence this action was taken in an attempt to discipline or in any way punish him. To the contrary, a thorough evaluation of all the communication relating to this decision, which appears in the Petitioner's personnel file, clearly indicates that the action was taken in a sincere effort to rehabilitate Petitioner's situation and give him an opportunity for a fresh start at another installation where he was not known and from which his problems were somewhat removed.

16. Recognizing, however, that Petitioner would most likely misconstrue the departmental actions and feeling that the best way to handle the situation would be to immediately remove the Petitioner from the park pending resolution, and in light of the fact that Petitioner had at that point failed to provide his supervisor with documentation confirming his continuing psychiatric care, Mr. Johnson, on February 19, 1987, placed Petitioner on the aforementioned administrative leave which required him to use accrued paid leave for a period of 18 days. Petitioner acknowledged receipt of this directive on February 20, 1987. This is an authorized and approved personnel action in an appropriate case. It was followed up by the three day suspension without pay also previously mentioned.

17. On March 16, 1987, Petitioner was permanently reassigned to Honeymoon Island as a park attendant. Under Department rules a "reassignment" is considered to be a move from one location to another less than fifty miles away. A "transfer" is a move of over fifty miles. Under the rules of the Department and the collective bargaining agreement covering Park Service employees, reassignments cannot be the subject of a grievance procedure or appeal. Honeymoon Island is

exactly forty-two miles, gate to gate, from HRSP, by the most direct route.

18. Petitioner claims that all or most of the actions taken against him by park management in this case are the result of a pervasive prejudice against black people in general and against him in particular and that the actions were the result of racial prejudice and discrimination rather than sound management. There is evidence that the former Assistant Park Manager, Mr. Yoczik, made disparaging remarks about blacks in general and about Petitioner in particular. However, only the first disciplinary action taken against Petitioner involved that individual.

19. Departmental policies regarding disciplinary punishment are designed to allow employees to correct a problem at an early stage. They are progressive in nature, and call for a reprimand for the first offense and successively more severe punishments leading up to dismissal as early as the third. It is clear that Petitioner was afforded more than ample opportunity to correct his performance. His first incident resulted in an oral reprimand. The second and third, which could have resulted in suspension without pay and dismissal respectively, resulted in written reprimands. It was only when his conduct gave cause for concern for employee and patron safety, that a suspension without pay was implemented and efforts undertaken to reassign him from the facility, not dismiss him as could have been done. Consequently, it is clear that by no reasonable characterization, could the Department's actions here be considered discriminatory based on his race.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and subject matter in this case. Section 120.57(1), *Florida Statutes.*

Petitioner contends that his suspension without pay and his reassignment to Honeymoon Island were based on the fact that he is black and constitutes racial discrimination. The Department contends that his suspension was a legitimate disciplinary action, consistent with the terms of it's promulgated rules and the terms of the collective bargaining agreement and was dictated by his aberrant behavior just prior to the suspension. The reassignment was implemented to remove him from the scene of his problems and give him a fresh start.

Under the provisions of Section 760.10(1)(a), *Florida Statutes,* it is an unlawful employment practice for an employer:

(a) To . . . or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . .

In order to prevail in a case involving alleged discrimination, the Petitioner must show, *prima facie,* that the Respondent has discriminated against him with respect to the particulars alleged herein. *McDonnell Douglas Corp. v Greene,* 411 U.S. 792 (1973); *Texas Department of Community Affairs v Burdine,* 450 U.S. 248 (1981). If Mr. Kinsey can sustain his initial burden, the Respondent then has to articulate a legitimate, nondiscriminatory reason for the actions it took against him in order to rebut the inference of unlawful discrimination.

Here, Petitioner has proved that he is black, that he was suspended without pay for three days, and that he was involuntarily reassigned from his former position at HRSP to Honeymoon Island. To that limited extent, he has shown a *prima facie* violation of Section 760.10(1)(a).

However, the Department has clearly articulated legitimate, nondiscriminatory reasons for its actions. Specifically, it has shown that the suspension action was taken after Petitioner had demonstrated aberrant behavior which included, *inter alia,* such things as threats to poison his lunch so that the "lunch thief" might pay for stealing it; statements that he possessed a gun along with veiled and indirect hints that he might use it on someone; and an unannounced and uninvited visit to his superior's home the night after having refused to enter what appeared to be warranted crisis intervention assistance. By the same token, there was some substantial psychiatric evidence that while he did not appear homicidal, he did not handle stress well and tended to be somewhat hysterical when under pressure.

Department officials, specifically Petitioner's supervisor and Park Manager, along with the District Manager, are responsible for maintaining a safe environment for department employees to work in and for park patrons to enjoy. As such, when in their individual and collective judgment, an employee is a potential threat to this environment, it is not only appropriate for them to take but would be a dereliction in their duties for them not to take prompt action to alleviate that threat. In this case, the decision was made to move Petitioner from HRSP to another facility. The move was not racially motivated.

A person with Petitioner's experience and skills was needed at Honeymoon Island and the Career Service System rule, Chapter 22A-7, F.A.C., not only authorizes such reassignment but precludes any

254

appeal by the reassigned employee. As relevant, Rule 22A-7.008 provides:

5. An employee who is reassigned from one position to another position shall not have the right to appeal such action to the Public Employees Relations Commission.

Rule 22A-7.009 clearly shows that Petitioner was reassigned, not transferred since the distance, by the most direct route, from his old place of duty to his new place of duty was less than 50 miles.

The decision having been made to reassign Petitioner, and it being recognized that such a move would undoubtedly be a stressful situation resisted by Petitioner, his supervisor concluded that, in light of his failure to properly secure permission to be absent when he had the car trouble reported, a three day suspension without pay, far less than that permitted under the terms of the department rules and the labor agreement, was appropriate to cover the time required to effect the reassignment. This, too, was not racially motivated.

Consequently, it is clear that the reasons articulated by the department for its actions are legitimate, do not discriminate against the Petitioner, and are not pretextual. Mr. Kinsey is not, therefore, entitled to relief because no violation of Chapter 760, *Florida Statutes,* has been proven by a preponderance of the competent, substantial evidence. Therefore, the Petition for Relief should be dismissed.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is, therefore:

RECOMMENDED that the Florida Commission on Human Regulations enter a Final Order denying Gaylor L. Kinsey the relief sought and dismissing the Petition for Relief.

RECOMMENDED this 10th day of January, 1989, at Tallahassee, Florida.